CUTRER, Judge.
This is a companion case to the cases of Gates Carlisle, Jr. v. State of Louisiana, through the Department of Transportation and Development, 400 So.2d 284 (La.App. 3rd Cir. 1981), and United States Fidelity & Guaranty Company v. State of Louisiana, through the Department of Transportation and Development, 400 So.2d 287 (La.App. 3rd Cir. 1981). We render separate decisions in each case this date.
These three suits arise out of a collision in the town of Florien, Louisiana, between an automobile being driven by Ollie Beeson and a large truck being driven by Douglas Howard.
Shortly after dark on March 14, 1977, Ollie Beeson was driving west along Louisiana Highway 118 approaching U. S. Highway 171. She was employed by Central Louisiana State Life Insurance Company as an insurance sales person. Gates Carlisle, her immediate supervisor, was a passenger in her car. U. S. 171 is a major highway running north and south and Louisiana 118 runs roughly east from U. S. 171. The two highways thus form a “T” intersection, but are not exactly perpendicular. Louisiana 118 intersects U. S. 171 at an angle. Traffic on Louisiana 118 is controlled by a stop sign which required Mrs. Beeson to stop at this intersection. Mrs. Beeson drove into the intersection, failing to yield to the large truck which was traveling north. The truck struck the left front of Mrs. Beeson’s vehicle. It is undisputed that Howard had the right of way and that he was unable to avoid the accident.
Mrs. Beeson was killed and Mr. Carlisle was severely injured in the accident.
Ollie Beeson’s husband, James Beeson, Jr., and their two major children, filed this suit against the State of Louisiana through the Department of Transportation and Development (Department) for the wrongful death of Mrs. Beeson.
Mr. Carlisle sued the Department, Maryland Casualty Company (Maryland), United States Fidelity & Guaranty Company (U. S. F. & G.) and Hartford Accident & Indemnity Company (Hartford). Maryland is the liability carrier for the Beeson vehicle. Hartford and U. S. F. & G. both provided underinsured motorists coverage to Carlisle.
Finally, U. S. F. & G., which was also the workmen’s compensation carrier for Central Louisiana State Life Insurance Company, sued the Department, the Estate of Mrs. Beeson, the Beeson family and Maryland, for reimbursement of medical expenses paid and compensation payments made to Mr. Carlisle and compensation death benefits paid to Mr. Beeson.
The trial court found the sole, proximate cause of the collision and the resulting damages and injuries was the negligence of the Department. The trial court expressly exonerated the truck driver and Mrs. Beeson of any negligence. Accordingly, the judgments were rendered as follows:
In the instant case, Beeson, Jr., et al. v. State of Louisiana, through the Department of Transportation and Development, judgment was awarded in favor of James Stanley Beeson, Jr., and against the Department in the amount of $66,736.00, plus legal interest. Judgment was also rendered against the Department in favor of James Stanley Beeson, III, and Lorraine Fay Bee-son in the amount of $37,500.00 each, plus legal interest.
That judgment also recognized the “intervention” of U. S. F. & G. and ordered the payment of $8,304.00, death benefits paid to the surviving husband by preference from the proceeds awarded Beeson herein[1] and *280 stated that U. S. F. & G.’s third party demand against Beeson, Jr., Beeson, III, and Lorraine Dove, for compensation benefits paid by U. S. F. & G., were dismissed with prejudice.[2] Maryland was granted judgment against the Department for $2,100.00, plus legal interest, to pay for the wrecked automobile.[3]
Judgment was also rendered in the case of United States Fidelity & Guaranty Company v. State of Louisiana, through the Department of Transportation and Development, Number 8187, granting U. S. F. & G. recovery against the Department in the amount of $14,172.00. Some $8,304.00 of this award was reimbursement of death benefits paid to James Beeson, Jr., and the other $5,868.00 was medical expenses paid on behalf of Gates Carlisle. It was further decreed that the judgment be given preference and priority over the judgments rendered in favor of James Beeson, Jr., et al. and Gates W. Carlisle, Jr., against the Department, in the above amounts, respectively-
In the case of Carlisle, Jr. v. State of Louisiana, through the Department of Transportation and Development, judgment was granted in favor of Carlisle and against the Department in the amount of $90,000.00 plus legal interest. Carlisle’s claims against Maryland, U. S. F. & G. and Hartford were dismissed. Judgment was also rendered in favor of U. S. F. & G. for $5,868.00 (medical expenses paid by U. S. F. & G.) against the Department.
In the instant case, Beeson, Jr., et al. v. State of Louisiana, through the Department of Transportation and Development, the Department appealed, contesting both liability and quantum. The Beesons answered the appeal seeking an increase in judgment in favor of James Beeson, Jr., to $200,000.00 and an increase of $50,000.00 each for the other two appellees.
The issues presented by this appeal are:
(1) Whether the Department was negligent or the highway defective due to improper signing, and if so, whether such negligence or defect was a cause of the accident;
(2) Whether Mrs. Beeson was negligent and, if so, whether such negligence was a cause of the accident; and
(3) Whether the judgments granted the plaintiff were excessive, inadequate or proper.
LIABILITY OF THE DEPARTMENT
The trial judge, in his reasons for judgment, made no findings of fact but adopted, by reference, the facts and law set forth in a brief filed by counsel for the Beesons. The brief referred to by the trial judge is not made a part of the record. The trial court concluded that:
"... the proximate cause of the collision and resulting damages and injuries was the poorly constructed and improperly signed intersection, and that there should be judgment against the Department of Transportation.”
This brings us to the crucial question of whether the trial judge was clearly wrong in the factual conclusion that the intersection was poorly constructed and improperly signed.
As we examine the facts we must keep in mind the extent of the obligations imposed *281 by law upon the Department in the performance of its duties to keep the highways in a reasonably safe condition. The general principles in this regard are set forth by this court in the case of Norris v. State, 337 So.2d 257, at 260 (La.App. 3rd Cir. 1976), where the court stated as follows:

“The Department of Highways is not the guarantor of the safety of all travelers on state highways nor is it the insurer against all injuries and damages which may result from defects or obstructions thereon. Wilkinson v. American Insurance Company of Newark. New Jersey. 311 So.2d 584 (La.App. 3rd Cir. 1975); Doucet v. State, Department of Highways. 309 So.2d 382 (La.App. 3rd Cir. 1975), writ denied 312 So.2d 340 (La.); Laborde v. Louisiana Dept. of Highways. 300 So.2d 579 (La.App. 3rd Cir. 1974), writ den. 303 So.2d 182 (La.).

“The duty of the Department of Highways has been most recently stated by this court in the case of Doucet v. State. Department of Highways, supra:

‘The duty of the Department of Highways is only to see that state highways are reasonably safe for persons exercising ordinary care and reasonable prudence. It is liable for damages only when the evidence shows (1) that the hazardous condition complained of was patently or obviously dangerous to a reasonably careful and ordinarily prudent driver. ...”
(Emphasis added) (Citations omitted) See also Von Cannon v. State. Department of Highways. 306 So.2d 437 (La.App. 3rd Cir. 1975), writs refused 309 So.2d 681 (La.) and numerous cases cited therein.

“Also pertinent is the recent Supreme Court case of Pickens v. St. Tammany Parish Policy Jury. 323 So.2d 430 (La.1975), in which the court stated:

‘There is no fixed rule for determining what is a dangerous defect in a public way; the facts and surrounding circumstances of each particular case control. The test usually applied, however, requires an answer to the question: Was the public way maintained in a reasonably safe condition for persons exercising ordinary care and prudence?’ (Citations omitted)”
With these principles in mind, we examine the facts leading up to this accident.
Ollie Beeson was employed by Central Louisiana State Life Insurance Company as a sales person. She had held this position for approximately 3% months prior to the fatal accident. She had some prospects located in the Florien-Mt. Carmel area which she intended to call upon. On March 14, 1977, she and her supervisor, Gates Carlisle, met in Tioga (near Alexandria) for the purpose of making calls on her Mt. Carmel prospects. At 4:00 P.M., Mrs. Beeson and Carlisle left Tioga, bound for the Mt. Car-mel area. Mrs. Beeson was driving her Toyota automobile with Carlisle as passenger. They proceeded to Natchitoches, Louisiana by way of Louisiana 1. From Natchi-toches to Many, Louisiana, they traveled Louisiana 6. At Many they turned south following U. S. 171 to the north edge of the town of Florien, Louisiana. At this point they turned east on Louisiana 118. At the time they made this turn onto Louisiana 118 it was still daylight. (It was at this intersection that the accident occurred two or three hours later.)
Mrs. Beeson traveled east on Louisiana 118 to the Mt. Carmel area. Carlisle testified that they made their calls and were successful in selling two insurance policies. They finished their work and began their return trip to Tioga at approximately 7:30 P.M. Carlisle remembers leaving the house of the last call but that is the last he remembers until after the accident. He stated that they intended to return to Tioga by the same route that they had taken in their trip to Mt. Carmel.
As Mrs. Beeson left Mt. Carmel, she was then approximately 4 miles from U. S. 171 which she had traveled upon a few hours earlier. Since Carlisle had retrograde amnesia and remembered nothing of the trip back to U. S. 171, and since Mrs. Bee-son was unfortunately killed in the accident, we have no testimony as to the events *282 occurring, up to the time of the accident, except that of the truck driver. He was only able to state that Mrs. Beeson failed to yield by driving out into the intersection directly in front of the truck causing the collision.
There is extensive evidence, however, including numerous pictures and testimony concerning the conditions of the intersection, the existence of and location of signs, including a stop sign along Louisiana 118 as one approached U. S. 171. As Mrs. Beeson arrived at a point approximately one-half mile from the intersection, the first sign indicating that she was nearing U. S. 171 was a sign on the right shoulder of the road reflecting “Florien Corp. Limit.” As she passed this sign, she crossed a cattle guard. The photograph, that reflects this sign, also shows that this two lane black topped road is straight from this point to the intersection. Louisiana 118 is practically level except for a slight downgrade beginning approximately 600 feet east of the intersection.
As Mrs. Beeson arrived at a point approximately 850 feet from the intersection, she was faced with a sign located on the outer portion of the right hand shoulder reflecting the words “Stop Ahead.” This sign was partially obscured on the night in question by a pine tree limb as Mrs. Beeson approached it. As she got close to the sign, however, it became clearly visible. This sign was reflectorized for nighttime motorists. There is some dispute as to the distance it was clearly visible. The estimates range from 15 feet to 105 feet. The photographs in evidence convince us that the sign was clearly visible for a distance of approximately 50 to 60 feet.
After Mrs. Beeson passed the “Stop Ahead” sign, and at a point approximately 500 feet from the intersection, she was faced with a sign located on the edge of the right shoulder which reflected “JCT 171.” This sign was likewise reflectorized for night drivers. This sign was clearly visible with no obstructions to impair the view.
Upon passing the Junction 171 sign and as she moved toward the intersection, another sign would be in view. This sign is also located on the outer edge of the right shoulder and reflects “171” and below this number is a double arrow reflecting that the intersection of U. S. 171 and Louisiana 118 is near. This sign is approximately 250 feet from the intersection.
At the intersection and approximately 15 feet to the right of the edge of Louisiana 118 is a reflectorized stop sign facing traffic approaching the intersection along Louisiana 118. This stop sign is not faced parallel with Louisiana 118 but was turned slightly toward Louisiana 118 and facing motorists traveling thereon, as was Mrs. Beeson on the night in question.
Also located at this intersection is a re-flectorized double arrow sign located facing the motorist on Louisiana 118 and across U. S. 171 indicating the presence of the intersecting highway U. S. 171 which runs north and south. This double arrow sign is flanked by two reflectorized striped panels standing on each side of the double arrow sign. We also note that a yellow “no passing” line exists extending from the intersection for some distance east along the center of Louisiana 118.
The above reflectorized signs and indicators were in place on the night of the accident. There were no adverse weather conditions that would impede a driver’s view. Mrs. Beeson had traveled through this intersection just two or three hours before the accident.
Duane L. Calhoun, Chief of Police of Flo-rien, testified that he received a call at 7:50 P.M. that the accident had occurred at the intersection of U. S. 171 and Louisiana 118 near the north edge of Florien. Upon arrival he found that the left front of the truck had struck the left front and side of the Beeson vehicle. Chief Calhoun further testified that he drove his vehicle east on Louisiana 118 to a point past the Florien Corporation limits sign and turned around to check the various signs leading up to the intersection. He found that all signs were in place and had not been disturbed. He explained that he checked the signs because, at times in the past, log trucks had *283 dislocated some of the signs. He was shown the photographs that are in the record and he stated that the photographs correctly reflect the positions and conditions of the signs as they existed the night of the accident and as we have described heretofore. He stated that the signs were reflec-torized and could all be seen for the distance of the range of his headlights. As to how far he could see the stop sign, he was asked at what distance he could see the same. His answer was as follows:

“A. Well, the length of your headlights at night ...

Chief Calhoun stated that he knew of no accidents occurring at this intersection prior to the one in question. He had been chief of police for close to four years.
Assisting Chief Calhoun in the investigation of the accident on that night was Trooper Guy Singletary, of the State Police. Trooper Singletary testified that he observed the stop sign which was facing traffic approaching on Louisiana lu8. He had no difficulty seeing the sign.
The trial court apparently relied heavily upon the testimony of plaintiff’s expert, Robert Canfield, in coming to its conclusions.
Robert Canfield was called by the plaintiff to give his opinion as to whether the intersection was properly signed. He stated that he found the signing of this intersection had deviated, in several instances, from the requirements of the Uniform Traffic Control Device Manual.[4] He criticized the location of the stop sign which was 15 feet from the edge of Louisiana 118. This would be 3 feet further than the suggested 12 feet in the manual. He further criticized the fact that the stop sign was turned slightly toward Louisiana 118 instead of facing straight down Louisiana 118. He felt that this condition may have a tendency to confuse the driver as to whether the stop sign controlled traffic on Louisiana 118 or U. S. 171.
Canfield also found fault with the placement of the large double arrow sign which ran parallel to U. S. 171. His reason for this criticism was not entirely clear.
Canfield also criticized the fact that the stop ahead sign was located 832 feet from the intersection instead of the suggested distance of 750 feet. He also noted the partial obscurement of the stop ahead sign by the tree limb. As noted previously herein, this condition kept the sign from coming into view until the traffic was 50 or 60 feet from the sign.
Canfield noted that the junction sign nearest the stop sign had the effect of obscuring the stop sign as a motorist approached the intersection. The motorist’s view of the stop sign would only be obscured momentarily. Otherwise the stop sign was in clear view of the motorist traveling on Louisiana 118.
Canfield concluded that the lack of compliance with the manual created an unsafe condition for the public traveling through this intersection.
The Department called Dr. Ned Walton, a traffic expert, to give his opinion as to the signing of the intersection. Dr. Walton testified that the manual sets forth suggested standards for the signing of a usual situation. These standards are not mandatory and may be adjusted to accommodate particular situations. Dr. Walton then discussed each of the criticisms made by Can-field. He then explained how each of such criticisms was within the discretionary guidelines of the manual.
As we examine Canfield’s testimony along with that of Dr. Walton and the clearly established facts discussed heretofore, we conclude that, while there may have been some deviation from the suggestions of the manual, such deviations were not such as would render the intersection as being improperly signed, creating an undue risk of harm to the traveling public.
“Failure to comply with the requirements of the Highway Department’s *284 manual does not constitute negligence per se.... ” Norris v. State, supra.
Also, there are several eases in the jurisprudence where the courts have found that, although there was room for some improvement in the road conditions and signing on a certain road, the efforts of the Department were adequate to discharge its duty to the motoring public. Norris v. State, supra; Roberts v. Winston Carriers, Inc., 304 So.2d 818 (La.App. 3rd Cir. 1974), writ ref’d, 309 So.2d 341 (La.1975).
We conclude that the trial court was clearly wrong in finding that the intersection in question created an undue risk of harm to the reasonably prudent driver. We have carefully examined the various views of the scene as depicted by the numerous photographs, the testimony of the investigating officers and the experts. We are fully convinced that at the time of this accident, this intersection and the approach to same along Louisiana 118 was properly signed and constructed. While there could have been some improvement in the situation, it cannot be said that the Department abrogated its duty to maintain a reasonably safe condition of the intersection for persons approaching same in a reasonably careful and prudent manner.
The judgment in the principal demand against the Department must be reversed and dismissed.
Having come to this conclusion, there is no necessity to discuss the remaining issues.
As we have previously noted in Footnote 1, 2 and 3, we will also rule upon those demands which were erroneously incorporated in this judgment, but actually emanate from the companion cases.
For the reasons set forth herein, the judgment of the trial court in favor of James Stanley Beeson, Jr., James Stanley Beeson, III, and Lorraine Fay Beeson Dove and against the State of Louisiana, through the Department of Transportation and Development is reversed, set aside and is hereby dismissed.
For the reasons set forth in the companion case of United States Fidelity & Guaranty Company v. State of Louisiana, through the Department of Transportation and Development, that portion of the judgment herein recognizing United States Fidelity & Guaranty Company’s “intervention” and rendering judgment ordering payment by preference of $8,304.00 to United States Fidelity & Guaranty Company, is reversed, set aside and is hereby dismissed.
For the reasons set forth in the companion case of Carlisle, Jr. v. State of Louisiana, through the Department of Transportation and Development, that portion of the judgment herein, recognizing a third party demand of Maryland Casualty Company and rendering judgment against the State of Louisiana, through the Department of Transportation and Development in the amount of $2,100.00, is reversed, set aside and is hereby dismissed.
Otherwise, than as herein reversed, the judgment of the trial court is affirmed.
All costs of this suit, both on appeal and in the trial court, shall be paid by plaintiffs-appellees.
AFFIRMED IN PART; REVERSED IN PART.

. This portion of the judgment, recognizing U. S. F. & G.’s “intervention” is a duplicate of a portion of the judgment rendered in the companion case of U. S. F. & G. v. State of Louisi *280 ana, through the Department of Transportation and Development.

. This demand does not appear in this suit but such demand was made in the companion case of U. S. F. & G. v. State of Louisiana, through the Department of Transportation and Development.

. We find no incidental demand by Maryland in this suit. We do find, however, that a third party demand by Maryland was incorporated in their answer in the companion Carlisle case. The judgment in Carlisle makes no disposition of such demand, however.
In these footnotes we point out errors that were made in the framing of these judgments. These errors result in ambiguity. Due to the conclusions that we have reached in these suits, however, correction of such errors is unnecessary. We have concluded that all claims, both in the principal actions and incidental demands, in all three cases must be dismissed. Under these circumstances, we will rule upon the judgments as they appear in each suit.

. This manual does not appear in the record. Apparently, it was never filed since the trial judge noted the absence of same.